No. 25-10979

# In the United States Court of Appeals
## for the Fifth Circuit

**Mary Dawes, Individually and the Administrator of the Estate of Decedent Genevive A. Dawes; Alfredo Saucedo; Virgilio Rosales**,

Plaintiffs – Appellants

v.

**City of Dallas; Christopher Hess; Jason Kimpel**,

Defendants – Appellees

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division

## BRIEF OF APPELLEE CITY OF DALLAS

TAMMY L. PALOMINO
City Attorney

J. CHEVES LIGON
State Bar No. 24070147
Assistant City Attorney

JENNIFER C. HUGGARD
Chief of Litigation

CITY ATTORNEY'S OFFICE
1500 Marilla Street, Suite 7DN
Dallas, Texas 75201
Telephone: 214-670-3519
Telecopier: 214-670-0622

NICHOLAS D. PALMER
Chief of Appellate Section

ATTORNEYS FOR THE CITY OF DALLAS

# EXEMPTION FROM CERTIFICATE OF INTERESTED PERSONS

The Appellee-Defendant City of Dallas (the "City"), as a governmental party, is exempt from the requirement to certify interested persons under Local Rule 28.2.1.

/s/ J. Cheves Ligon
*Attorney of Record for Appellee*
*City of Dallas*

## STATEMENT REGARDING ORAL ARGUMENT

The City believes oral argument is not necessary because the factual and legal issues in this appeal involve settled issues of law, so argument will not assist this Court in determining whether the evidence in the record creates a fact issue as to Appellants' *Monell* claims.

# TABLE OF CONTENTS

EXEMPTION FROM CERTIFICATE OF INTERESTED PERSONS ... 2

STATEMENT REGARDING ORAL ARGUMENT ................................... 3

TABLE OF AUTHORITIES ........................................................... 6

RESPONSE TO STATEMENT OF ISSUES ........................................... 12

1.   The district court correctly entered summary judgment in favor of the City because the evidence does not create a genuine issue of material fact concerning the reasonableness of the Officers' use of deadly force under the circumstances.

2.   The district court correctly entered summary judgment in favor of the City because this Court's precedent forecloses *Monell* liability against the City on Appellants' failure-to-train claims when this Court has already held that the Officers' conduct did not violate a clearly established constitutional right.

STATEMENT OF THE CASE ............................................................ 12

SUMMARY OF ARGUMENT ............................................................ 19

ARGUMENT ........................................................................ 20

I.   A motion for summary judgment based on use of force is reviewed de novo. ....................................................... 20

II.  The district court correctly rendered summary judgment for the City on Appellants' *Monell* claims on the ground that the Officers did not use unreasonable force under the Fourth Amendment. ................................................. 22

    A.   The *Graham* factors show the Officers' use of force was not unreasonable............................................ 23

1.   *Graham* factor one: severity of the crime at issue. ..... 24

2.   *Graham* factor two: whether the suspect poses an immediate threat. ......................................................... 27

3.   *Graham* factor three: whether the suspect is actively resisting or attempting to evade arrest. ........ 38

B.   Additional factor: speed with which the Officers used force. ...................................................................................... 40

III.   Appellants' arguments on appeal fail to demonstrate issues of fact as to the reasonableness of the Officers' use of force. ........................................................................................................ 42

A.   Appellants' rendition of the facts cannot change this Court's assessment of them from *Dawes I*. ............................ 42

B.   Any violations of City rules are irrelevant to this Court's analysis. ................................................................... 44

IV.   Appellants' *Monell* claims also fail because this Court found that the Officers did not violate clearly-established law............................................................................................................ 47

CONCLUSION.................................................................................... 59

CERTIFICATE OF SERVICE ................................................................ 61

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................... 62

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................ 20

*Arizona v. Johnson*,
    555 U.S. 323 (2009) ........................................................................ 42

*Baker v. Coburn*,
    68 F.4th 240 (5th Cir. 2023) ..................................................... passim

*Banks v. Herbrich*,
    90 F.4th 407 (5th Cir. 2024) .......................................................... 45

*Barnes v. Felix*,
    605 U.S. 73 (2025) .......................................................................... 26

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ........................................................................ 23

*Betts v. Brennan,*
    22 F.4h 577 (5th. Cir. 2022) .......................................................... 40

*Bolton v. City of Dallas*,
    541 F.3d 545 (5th Cir. 2008) .......................................................... 48

*Brown v. Lyford*,
    243 F.3d 185 (5th Cir. 2001) .......................................................... 56

*Buehler v. Dear*,
    27 F.4th 969 (5th Cir. 2022) ........................................................... 21

*Bustillos v. El Paso Cnty. Hosp. Dist.*,
    891 F.3d 214 (5th Cir. 2018) .........................................49, 50, 51, 52

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ........................................................................ 49

*Cole v. Carson,*
    935 F.3d 444 (5th Cir. 2019) ...................................................... 58

*Connick v. Thompson,*
    563 U.S. 51 (2011) ...................................................... 57

*Cooper Tire & Rubber Co. v. Farese,*
    248 F. App'x 555 (5th Cir. 2007) ...................................................... 13

*Cooper v. Brown,*
    844 F.3d 517 (5th Cir. 2016) ...................................................... 31

*Couthren v. State,*
    571 S.W.3d 786 (Tex. Crim. App. 2019) ...................................................... 35

*Crane v. City of Arlington,*
    60 F.4th 976 (5th Cir. 2023) ...................................................... 59

*Darden v. City of Fort Worth,*
    880 F.3d 722 (5th Cir. 2018) ......................................................21, 22, 31

*Dawes v. City of Dallas,*
    No. 22-10876, 2024 WL 2268529 (5th Cir. May 20, 2024),
    *cert. denied,* 145 S. Ct. 2699 (2025) ...................................................... passim

*Devine v. State,*
    786 S.W.2d 268 (Tex. Crim. App. 1989) ...................................................... 26

*Edwards v. City of Balch Springs,*
    70 F.4th 302 (5th Cir. 2023) ...................................................... 45

*Escarcega v. Jordan,*
    701 F. App'x 338 (5th Cir. 2017) ...................................................... 25

*Fraire v. City of Arlington,*
    957 F.2d 1268 (5th Cir. 1992) ......................................................35, 45

*Gene & Gene, L.L.C. v. BioPay, L.L.C.,*
    624 F.3d 698 (5th Cir. 2010) ...................................................... 43

*Graham v. Connor,*
490 U.S. 386 (1989) ................................................................. passim

*Groden v. City of Dallas,*
826 F.3d 280 (5th Cir. 2016) ............................................... 48

*Hershey. Hershey v. City of Bossier City,*
156 F.4th 555 (5th Cir. 2025)............................................... 53, 58

*Hicks-Fields v. Harris County,*
860 F.3d 803 (5th Cir. 2017) ............................................... 22

*Hillman v. Loga,*
697 F.3d 299 (5th Cir. 2012) ............................................... 21

*Howell v. Town of Ball,*
827 F.3d 515 (5th Cir. 2016) ............................................... 55

*Jean v. Guyger,*
No. 3:18-CV-02862-M-BH, 2023 WL 6388534
(N.D. Tex. Sept. 29, 2023) ................................................... 46

*Lindsey v. Sears Roebuck & Co.,*
16 F.3d 616 (5th Cir. 1994) ................................................. 20

*Littell v. Hous. Indep. Sch. Dist.,*
894 F.3d 616 (5th Cir. 2018) ............................................... 53

*Manis v. Lawson,*
585 F.3d 839 (5th Cir. 2009) ............................................... 22, 27

*Mann v. State,*
13 S.W.3d 89 (Tex. App.—Austin 2000) ........................... 36, 37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986)............................................................. 21

*McMurry v. Weaver,*
142 F.4th 292 (5th Cir. 2025)............................................. 43

*Moore v. State,*
   520 S.W.3d 906 (Tex. Crim. App. 2017)........................................... 35

*Newman v. Guedry,*
   703 F.3d 757 (5th. Cir. 2012) ....................................................... 40

*Ontiveros v. City of Rosenberg,*
   564 F.3d 379 (5th Cir. 2009) ........................................................ 27

*Pineda v. City of Houston,*
   291 F.3d 325 (5th Cir. 2002) ........................................................ 48

*Piotrowski v. City of Houston,*
   237 F.3d 567 (5th Cir. 2001) ........................................................ 48

*Ramirez v. Knoulton,*
   542 F.3d 124 (5th Cir. 2008) ........................................................ 45

*Ramirez v. Martinez,*
   716 F.3d 369 (5th Cir. 2013) ........................................................ 31

*Singleton v. Casanova,*
   No. 22-50327, 2024 WL 2891900 (5th Cir. June 10, 2024)...... 35, 45

*Solis v. Serrett,*
   31 F.4th 975 (5th Cir. 2022)......................................................... 40

*Trammell v. Fruge,*
   868 F.3d 332 (5th Cir. 2017) ........................................................ 40

*United States v. Hardeman,*
   449 F. App'x 408 (5th Cir. 2011) .................................................. 26

*United States v. Harrimon,*
   568 F.3d 531 (5th Cir. 2009) ........................................................ 26

*United States v. Smith,*
   814 F.3d 268 (5th Cir. 2016) .................................................. 12, 42

*Valle v. City of Houston*,
 613 F.3d 536 (5th Cir. 2010) ........................................................ 48

*Winfrey v. Rogers*,
 901 F.3d 483 (5th Cir. 2018) ........................................................ 12

*Winzer v. Kaufman County*,
 916 F.3d 464 (5th Cir. 2019) ........................................................ 56

**STATUTES**

TEX. PEN. CODE § 31.03 ..................................................................... 24

TEX. PENAL CODE § 1.07 ................................................................... 35

TEX. PENAL CODE § 22.07 ................................................................. 26

**RULES**

FED. R. CIV. P. 56 ............................................................................... 20

**OTHER AUTHORITIES**

Joanna C. Schwartz, *Backdoor Municipal Immunity*,
 132 Yale L.J. Forum 136 (2022) ................................................... 51

Joanna C. Schwartz, *Municipal Immunity*,
 109 Va. L. Rev. 1181 (2023) .......................................................... 52

Nancy Leong et. al., *Pleading Failures in Monell Litigation*,
 73 Emory L.J. 801 (2024) .............................................................. 57

No. 25-10979

---

# In the United States Court of Appeals for the Fifth Circuit

---

**Mary Dawes, Individually and the Administrador of the Estate of Decedent Genevive A. Dawes; Alfredo Saucedo; Virgilio Rosales**,

Plaintiffs – Appellants

v.

**City of Dallas; Christopher Hess; Jason Kimpel**,

Defendants – Appellees

---

## BRIEF OF APPELLEE CITY OF DALLAS

---

TO THE HONORABLE FIFTH CIRCUIT COURT OF APPEALS:

Defendant-Appellee, the City of Dallas (the "City") files this brief to demonstrate that the district court correctly granted summary judgment for the City on the municipal liability claims brought against it by Plaintiffs-Appellants, Mary Dawes, individually and on behalf of the estate of Genevive A. Dawes; Alfredo Saucedo, as next friend of minors K.R. and C.R.; and Virgilio Rosales.

## RESPONSE TO STATEMENT OF ISSUES

1.    The district court correctly entered summary judgment in favor of the City because the evidence does not create a genuine issue of material fact concerning the reasonableness of the Officers' use of deadly force under the circumstances.

2.    The district court correctly entered summary judgment in favor of the City because this Court's precedent forecloses *Monell* liability against the City on Appellants' failure-to-train claims when this Court has already held that the Officers' conduct did not violate a clearly established constitutional right.

## STATEMENT OF THE CASE

This appeal is the second time this case has been heard by the Court. In its prior examination of this case, the Court examined the undisputed facts of the incident at issue. *See generally Dawes v. City of Dallas ("Dawes I")*, No. 22-10876, 2024 WL 2268529 (5th Cir. May 20, 2024), *cert. denied*, 145 S. Ct. 2699 (2025). As such, in addition to citations to the record on appeal, the City cites to the undisputed facts as described by the Court in *Dawes I*.[1]

---

[1] "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Winfrey v. Rogers*, 901 F.3d 483, 491 (5th Cir. 2018) (cleaned up). "The doctrine is meant to promote judicial efficiency so that appellate courts do not continually have to reexamine subsequent proceedings in the same case. It forecloses reexamination on a subsequent appeal." *Id*. None of the exceptions to the rule—new evidence, new controlling authority, or a clearly-erroneous decision— apply. *Id*.; *see also United States v. Smith*, 814 F.3d 268, 273 (5th Cir. 2016) ("The law-of-the-case doctrine bars reexamination of issues of law or fact decided on appeal in subsequent proceedings in a trial or appellate court.")*; Cooper Tire & Rubber Co.*

On January 17, 2017, six officers with the Dallas Police Department ("DPD")—Officers Christopher Hess, Jason Kimpel, Christopher Alisch, Zachary Hopkins, Erin Evans, and Peter Lickwar (the "Officers")—were dispatched to investigate a suspicious vehicle parked in the parking lot of a Dallas apartment complex. *Dawes I*, 2024 WL 2268529, at *1; ROA.805. Dawes and Rosales (together, "Appellants") were inside the vehicle, a Dodge Journey, which had been reported stolen. *Dawes I*, 2024 WL 2268529, at *1; ROA.810-11. Officers Alisch and Hopkins were the first to arrive at the scene. *Dawes I*, 2024 WL 2268529, at *1; ROA.1092 [Hopkins Bodycam 2:30-3:00]. They located the vehicle, "which was boxed in on three of four sides—by fences to the front and left and by another car to the right." *Dawes I*, 2024 WL 2268529, at *1; ROA.1092 [Hopkins Bodycam 3:15]. Officers Alisch and Hopkins immediately began giving loud verbal commands to Appellants to "put [their] hands out the window." *Dawes I*, 2024 WL 2268529, at *1; ROA.1092 [Hopkins Bodycam 3:15-3:30].

---

*v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) ("The law of the case doctrine provides that a decision of a factual or legal issue by an appellate court establishes the law of the case and must be followed in all subsequent proceedings in the same case in the trial court.")

Officers Evans, Lickwar, Hess, and Kimpel arrived shortly thereafter. *Dawes I*, 2024 WL 2268529, at *1. Officer Hess positioned a police cruiser near the rear passenger side of the Journey, illuminated the cruiser's spotlight toward the Journey, and sounded the airhorn. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 4:10-4:30]. The Journey's windows were fogged, so the Officers at first could not immediately discern whether anyone was in the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 3:20-4:52]. Once the Officers confirmed that the Journey was occupied, they again identified themselves as police and issued several loud commands to Appellants to show their hands. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 4:40-5:45].

At this point in time, Officers Hopkins and Kimpel were positioned behind the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.1088 [Hess Bodycam 0:09-0:18], 1089 [Kimpel Bodycam 2:12-3:30], 1092 [Hopkins Bodycam 4:50-5:45]. "Hopkins decided to retreat and said, 'C'mon Kimpel, back up a little bit.' The officers retreated but remained in the path directly behind the Journey." *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 5:45-5:55].

14

Appellants failed to comply with the Officers' repeated verbal commands. *Dawes I*, 2024 WL 2268529, at *2. Instead, Dawes, who was in the driver's seat, started the Journey's engine, and began slowly driving backward. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:00-6:05]. Officer Hess exclaimed "watch out" as he pulled the patrol car closer to the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.1088 [Hess Bodycam 0:50-1:00]. As Dawes backed the Journey up, she collided with the patrol car. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:00-6:05]. Dawes then switched gears, "accelerated forward and hit the fence in front" of the Journey, which "visibly shook the surrounding trees." *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:05-6:11].

Throughout all of this, Officers Hopkins and Kimpel were still positioned behind the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.1089 [Kimpel Bodycam 3:07-3:30], 1092 [Hopkins Bodycam 5:55-6:11]. Officer Kimpel stated, "watch out," and began walking out of the Journey's path. *Dawes I*, 2024 WL 2268529, at *2; ROA.1089 [Kimpel Bodycam 3:26-3:30], 1092 [Hopkins Bodycam 6:10-6:13]. "Kimpel passed in front of Hopkins (and could not see Hopkins) as Kimpel traveled."

15

*Dawes I*, 2024 WL 2268529, at *2; ROA.1089 [Kimpel Bodycam 3:26-3:30], 1092 [Hopkins Bodycam 6:10-6:13].

Meanwhile, after the Journey struck the patrol car, Officer Hess jumped out of the patrol car and aimed his firearm toward the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.1088 [Hess Bodycam 1:03-1:05]. Officer Hess and others continued to order Appellants to show their hands. *Dawes I*, 2024 WL 2268529, at *2; ROA.1088 [Hess Bodycam 1:02-1:06], 1092 [Hopkins Bodycam 6:08-6:15]. Appellants still did not do so. Instead, after striking the fence, Dawes put the Journey back in reverse and began slowly driving the Journey backwards. *Dawes I*, 2024 WL 2268529, at *2; ROA.1088 [Hess Bodycam 1:09-1:19], 1092 [Hopkins Bodycam 6:10-6:18]. Officer Hess was unaware that Officers Kimpel and Hopkins had moved and, believing they were still in the Journey's path as it reversed, Hess fired multiple rounds at the Journey. *Dawes I*, 2024 WL 2268529, at *2; ROA.806, 1088 [Hess Bodycam 1:09-1:19]. Officer Kimpel simultaneously fired a single round at the Journey, as he believed Officer Hopkins was still in the path of the vehicle. *Dawes I*, 2024 WL 2268529, at *2; ROA.810, 1089 [Kimpel Bodycam 3:35-3:39]. "Hopkins's body cam reveals that, although he was not in Hess's and Kimpel's

immediate field of view, he had moved out of the Journey's path several seconds before Hess first fired." *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:10-6:20].

Sadly, Dawes was struck by the Officers' gunfire, and she passed away from her injuries. ROA.685. Rosales was not shot, but he was cut by glass from the Journey's shattered window. ROA.685. Appellants sued the City, Officer Hess, and Officer Kimpel under 42 U.S.C. § 1983, asserting that Hess and Kimpel used unreasonably deadly force in violation of the Fourth Amendment. ROA.681-707. Officers Hess and Kimpel invoked their defense of qualified immunity and moved for summary judgment. ROA.774-99. The district court granted the Officers' motion, holding that the Officers did not violate Appellants' clearly established constitutional rights. ROA.1245-55. The district court proceeded to analyze whether any constitutional infraction occurred at all. ROA.1256-66. It held that, on balance, Officers Hess's and Kimpel's use of force was reasonable under the circumstances such that there was no constitutional violation. ROA.1256-66. Because there was no constitutional violation, the district court also granted summary judgment to the City. ROA.1309-12.

Appellants appealed to this Court. In a 2-1 decision, this Court agreed with the district court's finding that Officers Hess and Kimpel were entitled to qualified immunity. *Dawes I*, 2024 WL 2268529, at *2-4. However, in *Dawes I,* the Court declined to opine on the threshold issue of whether there was a constitutional violation at all, albeit not a clearly established one. *Id.* at *4. Because the district court's holding that there was no constitutional violation was the sole basis for its original entry of summary judgment for the City, the Court remanded Appellants' claims against the City to the district court. *Id.* In doing so, the Court stressed that "the district court may reiterate its no rights-violation finding, may reconsider that finding, or may consider any other aspect of" Appellants' claims against the City. *Id.*

Following remand, the district court reiterated its original holding and again held that Appellants suffered no constitutional violation for the reasons stated in the district court's original opinion. ROA.1414-19. The district court additionally held that, even assuming there was a constitutional violation, this Court's holding in *Dawes I* that any such violation was not clearly established was fatal to Appellants' claims

18

against the City. ROA.1417 n.9. The district court thus again entered final judgment for the City, which Appellants now appeal.

## SUMMARY OF ARGUMENT

The Court should affirm the district court's judgment. The undisputed facts establish that: the Officers were responding to a call of a suspicious vehicle; the vehicle was reported to be stolen; the Officers identified themselves as police and gave repeated verbal commands to the occupants of the vehicle to show their hands; the occupants of the vehicle ignored the commands; the occupants of the vehicle instead started the engine and began trying to back the vehicle out of parking space striking a fence and patrol car in the process; that two officers were in the path of the vehicle within seconds of when officers initiated force; and the officers that fired their weapons still believed fellow officers were in the vehicle's path and thus in imminent danger. On these facts, the district court correctly held that the Officers' use of force did not violate the Fourth Amendment.

Additionally, even assuming the Officers' force was unreasonable (it was not), the district court correctly entered summary judgment for the City because Appellants failed to demonstrate *Monell* liability. In

19

holding that Appellants could not establish *Monell* liability, the district court correctly applied this Court's controlling precedent holding that where, as here, municipal employees' conduct does not violate clearly established law, their governmental employer cannot be deemed to have been deliberately indifferent on a failure-to-train theory.

## ARGUMENT

### I. A motion for summary judgment based on use of force is reviewed de novo.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

> [W]here the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted.

*Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (internal citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must

be resolved in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hillman v. Loga*, 697 F.3d 299, 302 (5th Cir. 2012).

To prevail on an excessive force claim, a plaintiff must show that the force employed was "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (cleaned up). The focus is not best practices or desired outcomes, but instead, "the touchstone of [the Court's] inquiry is simply the *reasonableness* of the force employed." *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022) (emphasis added).

"In making this determination, a court should consider the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darden*, 880 F.3d at 728-29 (quoting *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 729 (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. However, "[t]he question is one of 'objective reasonableness,' not subjective intent, and an officer's conduct must be judged in light of the circumstances confronting him, without the benefit of hindsight." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

## II.    The district court correctly rendered summary judgment for the City on Appellants' *Monell* claims on the ground that the Officers did not use unreasonable force under the Fourth Amendment.

Appellants concede the settled principle of law that if a municipality's employee has not violated an individual's constitutional rights, *Monell* liability cannot attach to the municipal employer. (*See* Appellants' Br. 30 ["If the Section 1983 claims against police officers are dismissed because of the lack of a constitutional violation, the claims against the City would also be defeated."].) *See Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017) ("'As is well established, every

*Monell* claim requires "an underlying constitutional violation.""""). For the reasons stated below, the salient undisputed facts of this case—as determined in *Dawes I*—show the officers did not violate Appellants' Fourth Amendment rights. As such, their *Monell* claims fail, and the Court should affirm the district court's judgment.

### A. The *Graham* factors show the Officers' use of force was not unreasonable.

Determining whether a use of force was reasonable under the Fourth Amendment "is not capable of precise definition or mechanical application." *Graham*, 490 U.S. 386 at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case, including" what are known as the *Graham* factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. Thus, the central determination is

"whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

All three *Graham* factors weigh in the Officers' favor, as does the oft-examined additional factor of the speed with which the officers used force.

### 1.    *Graham* factor one: severity of the crime at issue.

The first *Graham* factor weighs in favor of the Officers because it is undisputed that the Officers were responding to serious felony offenses. As this Court recognized in *Dawes I*, the Officers were responding to a call of a suspicious vehicle, which was "parked . . . in the back corner of an apartment complex parking lot" at night, and which was reported stolen. *Dawes I*, 2024 WL 2268529, at *1; ROA.810-12. In Texas, it is a state jail felony to steal property worth between $2,500 and $30,000, and a felony of the third degree to steal property worth between $30,000 and $150,000. *See* TEX. PEN. CODE § 31.03(e)(4)-(5). While the exact value of the vehicle, a Dodge Journey, was not readily available at the scene, a reasonable officer could certainly have assumed the vehicle was worth more than $2,500. This Court has found elsewhere that car theft is a serious crime. *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023)

(recognizing the first *Graham* factor weighed in favor of officer's use of deadly force where the suspect was "suspected of committing car theft"); *Escarcega v. Jordan*, 701 F. App'x 338, 341 (5th Cir. 2017) ("Regarding the first [*Graham*] factor, Escarcega had committed several dangerous offenses, including stealing a car . . . ."). Notably, even the dissent in *Dawes I* conceded that "the severity of plaintiffs' suspected crime of stealing a vehicle—a felony under Texas law—may weigh in favor of the officers."[2] 2024 WL 2268529 at *5 (Dennis, J., dissenting). In sum, car theft is a serious crime under *Graham*, and under Texas law, as the *Dawes I* dissent correctly judged.

Further, while the *Graham* factor of whether a suspect is fleeing is more fully explored below, a reasonable officer on the scene could have reasonably determined that Appellants were attempting to flee when they began to drive the Journey backwards against the Officers'

---

[2] While common experience reveals the damage car thefts can bring, statistics show how widespread a problem it is. According to the Texas Department of Motor Vehicles, "over 65,000 cars and trucks are stolen and almost 200,000 are burglarized each year" in Texas. Tex. Dep't of Motor Vehicles, https://www.txdmv.gov/motorists/consumer-protection/auto-theft-prevention (last visited Jan. 24, 2026.) One recent publication from the National Highway Traffic Safety Administration notes that "[e]ach year, vehicle theft costs Americans more than $8 billion. Victims are left handling the aftermath, such as higher insurance premiums and vehicle depreciation if they're lucky enough to get their vehicle back." Press Release, *Consumer Alert: NHTSA Reminds Drivers to Safeguard Their Vehicles*, https://www.nhtsa.gov/press-releases/reminder-to-safeguard-vehicles (last visited Jan. 24, 2026).

commands. As this Court has found, fleeing by vehicle is a "purposeful, violent, and aggressive" felony under Texas law. *United States v. Harrimon*, 568 F.3d 531, 534, 537 (5th Cir. 2009); *see also Barnes v. Felix*, 605 U.S. 73, 86 (2025) (Kavanaugh, J., concurring) ("Fleeing from the traffic stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest."). Appellants' backing of the Journey towards the Officers against their commands was a threatening act in and of itself. In Texas, a person commits a terroristic threat offense "if he threatens to commit any offense involving violence to any person or property with intent to . . . place any person in fear of imminent serious bodily injury." TEX. PENAL CODE § 22.07(a)(2). A violation of Texas Penal Code section 22.07(a)(2) "is a state jail felony if the offense is committed against a person the actor knows is a peace officer or judge." *Id.* § 22.07(c-1). "Imminent" under the statute "means 'near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous.'" *United States v. Hardeman*, 449 F. App'x 408, 410 (5th Cir. 2011) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989)).

26

Appellants' act of backing up towards where officers were believed to be standing and where it is undisputed "an officer had stood . . . seconds before," *Dawes I*, 2024 WL 2268529, at *3, coupled with the undisputed evidence that the Officers identified themselves as police and had repeatedly ordered Appellants to show their hands, *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 4:40-5:45], reasonably led the Officers to perceive an imminent threat to the Officers' lives. This reasonably qualifies as a felony under the Texas Penal Code. As such, a reasonable officer could have concluded that Appellants had committed, were about to commit, or were committing multiple serious offenses. Therefore, the first *Graham* factor weighs in the Officers' favor.

### 2. *Graham* factor two: whether the suspect poses an immediate threat.

"An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis*, 585 F.3d at 843 (citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)). Therefore, "the second [*Graham*] factor— whether there is an immediate threat to safety—is generally the most

important factor in determining the objective reasonableness of an officer's use of deadly force." *Baker*, 68 F.4th at 247-48.

The district court held that, "[a]lthough this case presents a relatively close question of whether a constitutional violation occurred . . . , on balance, Officers Hess and Kimpel reasonably believed that Dawes posed a threat of serious harm to themselves and other officers." ROA.1257; *see* ROA.1414 ("This Court, having reviewed the evidence again, maintains its prior finding that there was no constitutional violation by the officers."). The undisputed facts recounted by this Court in *Dawes I* identified numerous factors that—taken together in the totality of the circumstances—show a reasonable officer would have reasonably perceived Appellants' actions as an immediate threat of serious bodily injury or death:

- Appellants were in a vehicle the Officers were informed was stolen;

- Appellants refused loud and repeated commands to show their hands after the Officers identified themselves as police;

- Dawes attempted to back the Journey out of its parking spot, struck a police cruiser, then accelerated forward and struck the fence in front of the Journey;

- Officers Kimpel and Hopkins were positioned behind the Journey when Dawes drove it into the fence;

- Officers continued shouting commands for Appellants to show their hands, but those commands were ignored;

- After hitting the fence, Dawes immediately reversed and began backing up again;

- Officer Kimpel believed Hopkins was still behind the Journey when Dawes reversed for the second time because "Kimpel passed in front of Hopkins (and could not see Hopkins) as Kimpel traveled"; and

- When Dawes reversed the Journey for the second time, Officer Hess believed that Officers Kimpel and Hopkins "were in the path of the reversing Journey," where they had "stood . . . seconds before."

*Dawes I*, 2024 WL 2268529, at *2. On these facts, the district court correctly held that

> Officers Hess and Kimpel reasonably believed that Dawes posed a threat of serious harm to themselves and other officers. Specifically, Officer Hess reasonably believed that Officers Kimpel and Hopkins were in danger. Officer Kimpel reasonably believed that Officer Hopkins was in danger, and the officers reasonably acted in accord with those reasonable beliefs.

ROA.1262.

These facts evince a rapidly evolving situation. Officers were confronted with two suspects in a reportedly stolen vehicle who were not complying with repeated verbal commands. Instead, Appellants attempted to leave the scene. It is undisputed that Officers Kimpel and Hopkins were originally positioned behind the Journey. But in the tense

seconds leading up to when Officers Hess and Kimpel fired their weapons, Kimpel and Hopkins had moved, although Hess was unaware either had moved, and Kimpel was unaware Hopkins had moved. ROA.806, 810.

Appellants emphasize the fact that, at the moment Officer Hess fired the first shot, Officers Kimpel and Hopkins were no longer in fact behind the Journey. (*See* Appellants' Br. 6-7.) They further attempt to diminish the danger posed by a moving vehicle by stressing that the Journey was moving slowly and urging that Appellants were not trying to flee police because, upon waking, they did not know that the people outside of the vehicle were police. (*See id.* 4-7.) Appellants arguments misconstrue the relevant inquiry. The constitutional question is whether, "judged from the perspective of a reasonable officer on the scene," (i.e., not Appellants' perspective) and without "the 20/20 vision of hindsight" the Officers could have reasonably perceived Dawes's driving of the Journey posed a threat. *Graham*, 490 U.S. at 396. It was reasonable for Officers Hess and Kimpel to believe that Officer Hopkins (from both perspectives) and Officer Kimpel (from Officer Hess's perspective) were still positioned behind the Journey where they were last seen. And it was

reasonable to perceive a moving vehicle as a threat, as if a suspect were intent on attempting to flee, all she need do is accelerate.

The facts starkly contrast with the circumstances where this Court has found a fact issue as to the existence of an immediate threat. *See, e.g., Darden*, 880 F.3d at 729 (holding fact issues precluded summary judgment where jury could find suspect was not accused of serious crimes, the suspect never threatened officers, and suspect had raised his hands before officers struck, kicked, and tased the suspect); *Cooper v. Brown*, 844 F.3d 517, 522-23 (5th Cir. 2016) (finding no immediate threat where the suspect was not suspected of committing a violent offense, was not resisting, and officer could see the suspect's hands and that he had no weapon); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding a reasonable officer could not have concluded arrestee posed a threat when arrestee was not the subject of the arrest warrant and had only questioned why officers were at his place of business).

The Court's recent decision in *Baker* is instructive on the second *Graham* factor. There, as here, officers were told that the car the suspects were driving was stolen. *Baker*, 68 F.4th at 242-43. The officers, Coborn and McHugh, followed the suspects to a gas station. *Id.* at 242. They

approached the suspects as they were refueling the stolen vehicle. *Id.* at 243. One suspect, Baker, was sitting in the driver's seat. *See id.* Upon seeing the officer's approach, the second suspect dropped the gas pump and jumped into the front passenger seat. *Id.* While positioned on either side of the vehicle, the officers ordered the suspects to show their hands and roll down the windows. *Id.* The officers, however, could not see into the car due to the dark window tinting. *Id.* Therefore, Officer Coborn moved in front of the car to look through the windshield. *Id.* "[V]ideos then show the sedan's brake lights come on, but the car remained stationary. At this moment, McHugh can be heard yelling, 'you go forward . . . ,' but was interrupted by Coborn discharging his firearm into the windshield." *Id.*

Then, the car began moving forward and to the left. *Id.* at 243. As the car moved past Coborn he fired a second round of shots. *Id.* at 243, 245 n.6. Officer McHugh also fired at the car as it drove away. *Id.* at 243. Two of the officers' bullets struck Baker from behind, and one of those wounds proved fatal. *Id.* at 244. Baker's estate sued Coborn and McHugh, asserting they used unreasonable deadly force. *Id.*

The Court held that Coborn was entitled to qualified immunity for his first round of shots—those he fired through the windshield. *Id.* at 245-47. In so holding, the Court did not opine on whether Coborn's initial round of shots violated the Fourth Amendment.[3] *Id.* Instead, it hinged its holding on the second prong of qualified immunity, holding Baker failed to identify adequate precedent to show the alleged unconstitutionality of Coborn's first shots was clearly established. *Id.* Critically, however, implicit in the Court's reasoning was its recognition that *a moving vehicle poses a threat to the safety of officers*. *Id.* at 246-47. In addressing why one of the precedents that Baker's estate invoked failed to overcome qualified immunity, the Court distinguished it because, in that case, "*there was no concern about the car itself being used as a weapon*, as the suspect . . . did not start the car and illuminate his brake lights directly in front of the officer." *Id.* at 246-47 (emphasis added).

---

[3] The Court's decision not to address the threshold issue of the constitutionality of Coborn's shots into the windshield was likely due to the fact issues that the Court found existed concerning the first round of shots. Specifically, the Court found that fact issues existed over whether Coborn began firing before or after the suspects' car started moving. *Baker*, 68 F.4th at 243 & n.3. There were also fact issues over Coborn's stated reasons for opening fire before the car started moving. Coborn claimed that he started shooting because Baker bent down and Coborn feared Baker was reaching for a weapon. *Id.* at 243. Conversely, Baker's estate maintained that Baker only bent down to take cover after Coborn started shooting. *Id.*

33

The Court proceeded to hold that fact issues existed that could permit a reasonable jury to find that the second round of shots—those fired after the suspects' vehicle cleared Coborn—were unconstitutional. *Id.* at 247-51. Once again, critical to the Court's analysis of the constitutionality of the second round of shots was the fact that evidence indicated the suspects' vehicle no longer posed a threat to Coborn, as it had already driven past him. *Id.* at 248. Baker was shot twice from behind, showing that the officers continued to shoot after the vehicle cleared Coborn and knew the car no longer posed a danger. *Id.* Thus, the Court held that a jury could conclude that the vehicle no longer posed a threat such that the second round of shots were unreasonable. *Id.* at 251.

As the Court recognized in *Baker*, Appellants' ignition of the engine and efforts to move the Journey while the Officers were in close proximity presented a real and substantial threat to the Officers' safety. However, unlike in *Baker*, the record in this case lacks any of the critical evidence that led the Court to find issues of fact concerning the reasonableness of the officers' use of force in *Baker*. Indeed, in *Dawes I*, this Court already recognized that

> *Baker* involved several fact disputes, including whether shots
> were fired after a vehicle was, in daylight and in the plain

34

view of every responding officer, traveling away from officers when they fired. Here, the facts exhaustively documented by multiple cameras cannot be disputed. Shots were fired in the dead of night as a vehicle traveled towards a location an officer had stood in seconds before.

2024 WL 2268529 at *3.

State law similarly reinforces that the Journey posed a threat to the Officers. In Texas, a car is not "'manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury.'" *Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017) (quoting TEX. PENAL CODE § 1.07(a)(17)(A)). However, while "a motor vehicle is not a deadly weapon *per se*, it can be found to be a deadly weapon *if it is used in a manner* that is capable of causing death or serious bodily injury." *Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App. 2019) (citing TEX. PENAL CODE § 1.07(a)(17(B)). Manner of use is determined by examining whether the driving was reckless or dangerous. *Id.* at 790. This Court has recognized this principle. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992) (finding officer firing on car not excessive where the vehicle was in danger of running over officer); *see Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *7 n.10 (5th Cir. June 10, 2024) ("Of course, items other than guns and knives,

35

including motor vehicles, can be deadly weapons in certain circumstances.")

Vehicles may still be "deadly weapons" even where no one is injured, much less killed. In an illustrative example, in *Mann v. State*, the court addressed the issue of whether an automobile may be a "deadly weapon" in a felony DWI case where no one was injured, let alone killed. 13 S.W.3d 89, 92 (Tex. App.—Austin 2000), *opinion adopted*, 58 S.W.3d 132 (Tex. Crim. App. 2001). There, a police officer observed the suspect run his car completely upon the curb before veering back onto the roadway. *Id.* at 91. As the suspect neared a curve, he drove his car straight towards another driver, whom he would have hit head-on but for the other driver's evasive maneuvers. *Id.* Concerned that the suspect was "going to kill or injure someone," the officer initiated a traffic stop. *Id.* The suspect exited his vehicle and displayed classic signs of intoxication. *Id.* At the criminal trial, one police officer testified that the suspect's vehicle could have caused serious bodily injury or death. *Id.* As such, the jury convicted the suspect of felony DWI with an affirmative finding that his driving constituted use of a deadly weapon. *Id.* at 90.

On appeal, the suspect challenged the jury's deadly-weapon finding. *Id.* at 91-92. The court of appeals upheld the verdict, citing as sufficient evidence to support the deadly-weapon finding: (1) the suspect "almost hit another vehicle head-on" when his vehicle crossed the roadway's center line; (2) the only reason a serious collision did not happen was because the other vehicle's driver "took evasive action"; and (3) opinion testimony by a police officer with experience in reconstructing accidents was evidence that a wreck in such a circumstance *could* cause death or serious bodily injury. *Id.*

Here, while the Journey did not cause a serious injury or death, its backing maneuver towards the officers could well have constituted use of a deadly weapon under Texas law. In such close quarters, "in the dead of night" the Journey "traveled towards a location an officer had stood in seconds before." *Dawes I*, 2024 WL 2268529 at *3. Indeed, like the other driver in *Mann* who took evasive action, Officer Hopkins "had moved out of the Journey's path" in the seconds prior to the shooting. *Id.* at *2. But given the circumstances and miniscule time to react, the Journey was more than a hypothetical danger.

In sum, a reasonable officer would have deemed the Journey a deadly and imminent threat as it began to back out in such close quarters after ignoring multiple commands and driving into a fence. As such, the second *Graham* factor weighs in the Officers' favor.

### 3. *Graham* factor three: whether the suspect is actively resisting or attempting to evade arrest.

Here, this Court has identified indisputable evidence that the occupants of the Journey were attempting to flee. First, the Officers made loud and repeated commands for Appellants to show their hands after they identified themselves as police. *Dawes I*, 2024 WL 2268529 at *2; ROA.1092 [Hopkins Bodycam 4:40-5:45]. The Journey reversed backwards and struck a police cruiser. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:00-6:05]. After more unheeded commands, the Journey lurched forward into a fence such that "the sound of the impact is audible on Hopkins's body camera, and the jolt of the fence visibly shook the surrounding trees." *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:05-6:11]. After hitting the fence, the Journey immediately reversed yet again. *Dawes I*, 2024 WL 2268529, at *2; ROA.1092 [Hopkins Bodycam 6:10-6:18].

Appellants' noncompliance with the Officers' commands is significant, but perhaps more telling, before any shots were fired, the Journey had already struck a police cruiser and a fence *before* it began backing again. *Dawes I*, 2024 WL 2268529, at *2. A reasonable officer on the scene—with less than a second to determine his course of action— would interpret the combination of multiple ignored commands with a car continuing to move after striking two objects as a willful attempt to flee police.

Whatever Appellants' true intentions were, their actions presented a reasonable perception of risk to the Officers and that they were attempting to flee. The Fourth Amendment does not require an officer to hope the driver of a stolen vehicle has good intentions—or is simply confused—when he or she backs directly into the area where an officer had been only seconds before and after hitting a police cruiser and a fence. Instead, a reasonable officer would have perceived that the vehicle was attempting to flee.

Therefore, the third *Graham* factor weighs in the Officers' favor.

39

**B.    Additional factor: speed with which the Officers used force.**

"Although not listed in the *Graham* factors, courts also consider the speed with which officers resort to force." *Solis v. Serrett,* 31 F.4th 975, 983 (5th Cir. 2022). Thus, where suspects are given no substantive opportunity to comply with officers' commands, uses of force can be excessive. *Compare Betts v. Brennan,* 22 F.4h 577, 583-84 (5th. Cir. 2022) (finding speed-of-use in officer's favor where force used only after "tried to get Betts to stand behind the truck by invitation, explanation, command, and even by grasping his arm. And [the officer] warned Betts more than once that he would be tased if he did not comply with his orders."), *with Trammell v. Fruge,* 868 F.3d 332, 342 (5th Cir. 2017) (finding fact issue where "only three seconds elapsed between [the officer's] initial request that the [suspect] place his hands behind his back" and when the officers tackled the suspect); *Newman v. Guedry*, 703 F.3d 757, 763 (5th. Cir. 2012) (finding fact issue where "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to'" force).

Here, the Officers did not resort to use of deadly force when: the Appellants failed to obey the Officers' multiple commands to "put [their] hands out the window," ROA.1092 [Hopkins Bodycam 3:15-5:45]; the Journey struck a police cruiser, ROA.1092 [Hopkins Bodycam 6:00-6:05]; the Journey struck a fence with sufficient force as to rattle trees, ROA.1092 [Hopkins Bodycam 6:05-6:11]; after one officer sounded his horn and turned on the cruiser's spotlight in a show of authority, ROA.1092 [Hopkins Bodycam 4:10-4:30]; after one officer attempted to open the Journey but found it locked, ROA.1092 [Hopkins Bodycam 4:44-4:48]; or, the Officers again shouted more instructions to the occupants to show their hands after hitting the fence. *Dawes I*, 2024 WL 2268529 at *2. Instead, the Officers used force only when Dawes began backing the Journey a second time "towards a location an officer had stood in seconds before" and where they were still believed to be positioned. *Id.* at *3.

Further, in considering such encounters, the Supreme Court "has recognized that traffic stops are especially fraught with danger to police officers. The risk of harm to both the police and the occupants of a stopped vehicle is minimized, we have stressed, if the officers routinely exercise

41

unquestioned command of the situation." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). Here, the officers made numerous and varied attempts to exercise that command of the situation without resorting quickly to force, but Appellants repeatedly refused to comply.

In sum, given the totality of the circumstances, the Officers on scene did not violate Appellants' constitutional rights because their use of deadly force was reasonable under the circumstances. As such, Appellants cannot maintain a *Monell* claim against the City.

**III.  Appellants' arguments on appeal fail to demonstrate issues of fact as to the reasonableness of the Officers' use of force.**

**A.  Appellants' rendition of the facts cannot change this Court's assessment of them from *Dawes I*.**

As noted above, the law-of-the-case doctrine, meant to promote judicial efficiency, "bars reexamination of issues of law or fact decided on appeal in subsequent proceedings in a trial or appellate court." *Smith*, 814 F.3d at 273. The Court denied rehearing en banc in *Dawes I*, *see* Aug. 20, 2024 Order (ECF No.98-1), *Dawes v. City of Dallas*, No. 22-10876, and the Supreme Court denied Appellants' petition for writ of certiorari. *Dawes v. City of Dallas*, 145 S. Ct. 2699 (2025).

"Exceptions to the doctrine allow reexamination of issues decided on appeal only if (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work a manifest injustice." *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010) (cleaned up). Appellants make no argument, either directly or indirectly, that any of the exceptions apply here. Indeed, this Court is dealing with the same record as before.

Appellants cite, and the City is unaware of, no case law that an appellate court's examination of the facts for qualified immunity is somehow cursory, whereas an examination of the facts for determination of a constitutional violation is more robust. True, the methods and burden-shifting for judging the facts against the case law are different. *See, e.g.*, *McMurry v. Weaver*, 142 F.4th 292, 299 (5th Cir. 2025) (explaining qualified immunity's unique two-pronged approach and the shifting of burden). However, this Court already viewed the record in this case—including multiple body-worn cameras of the incident with multiple viewpoints—and has "narrate[d] in some detail" the undisputed

43

facts. *Dawes I*, 2024 WL 2268529 at *1-2. Indeed, this Court even stated that "[h]ere, the facts exhaustively documented by multiple cameras cannot be disputed." *Id*. at *3.

As such, the undisputed facts as recounted *Dawes I* are the undisputed facts for purposes of this appeal. Therefore, insofar as Appellants attempt to recast the facts, their attempts are unavailing.

### B.    Any violations of City rules are irrelevant to this Court's analysis.

Appellants stress that DPD disciplined Officers Hess and Kimpel as a result of the incident. (Appellants' Br. 11, 22-26.) This includes the City's determination that Officers Hess and Kimpel violated DPD's "use-of-deadly-force policy." (Appellants' Br. 22 [citing ROA.1079-80, 1083-84].) Appellants argue that such violations are relevant because, "[h]ere, the use of force policy that Hess and Kimpel violated tracks the standard for excessive force under the Fourth Amendment." (Appellants' Br. 25-26.) This argument fails for numerous reasons.

*First*, Appellants claim that DPD's general orders concerning the use of deadly force "tracks" the Fourth Amendment. This representation is wholly conclusory. Appellants fail to discuss the contours of DPD's general orders or how they "track" the Fourth Amendment. Further,

Appellants do not explain why a municipality's departmental determination of whether an officer violated departmental regulations concerning the use of force has any impact on a federal court's analysis of the Fourth Amendment. An "officer's reasonableness in using force is analyzed under an *objective standard* in light of the facts and circumstances confronting the officer, without regard to his or her underlying intent or motivation." *Edwards v. City of Balch Springs*, 70 F.4th 302, 311 (5th Cir. 2023) (cleaned up).

*Second*, this Court has long recognized that the issue of whether an officer's use of force was reasonable under the Fourth Amendment is distinct from the issue of whether the officer strictly adhered to departmental protocols. "[A]n officer's conduct is not unconstitutional merely because it violates police procedure or the officer acted negligently." *Singleton*, 2024 WL 2891900, at *6 (citing *Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008)); *see, e.g.*, *Banks v. Herbrich*, 90 F.4th 407, 416 (5th Cir. 2024) ("violations of internal procedures or policies are insufficient to give rise to constitutional violations"); *Fraire*, 957 F.2d at 1276 ("even a negligent departure from established police procedure does not necessarily signal violation of constitutional

protections"). The Fourth Amendment sets the constitutional floor, but a police department is free to enact procedures or regulations that go beyond the constitutional minimum the Fourth Amendment requires. Indeed, to permit internal training and rules to factor into the Fourth Amendment's reasonableness standard would perversely incentivize departments to only proscribe officers' actions to the constitutional floor, lest they unintentionally expand liability for their own officers. This could also create a patchwork of constitutional rights, even within the same state, where the "reasonable officer" standard would vary based solely on internal rules and training. As the Northern District of Texas found, Dallas's "officers receive[] training beyond what Texas law requires under the longest training program in the state." *Jean v. Guyger*, No. 3:18-CV-02862-M-BH, 2023 WL 6388534, at *7 (N.D. Tex. Sept. 29, 2023); *see also id.* at *1 (describing DPD training and noting that "[t]otaling thirty-eight weeks, the length of the City's police training program is at the top of the list of other Texas cities."). This includes drilling techniques to reduce the use of force that go well beyond constitutional minimums. *See, e.g.*, *id.* at *2 (explaining DPD's unique "'Cover + Distance = Time'" method to, *inter alia*, better "assess the

situation, consider all available options, coordinate a response with cover officers, think and make a good, unrushed decision, to utilize lesser force options, such as handcuffs or a taser."). But whether an officer follows her DPD training and rules, such as "Cover + Distance = Time," does not speak to whether her actions fell below Fourth Amendment standards.

Nor should it. The Fourth Amendment means the same in the City as it does in jurisdictions that impart less training and prescribe fewer rules for their law enforcement officers. Neither the City nor its officers should be punished for any of the DPD's efforts to go beyond the constitutional "floor."

Therefore, whether any of the officers did or did not break DPD's internal rules is immaterial to whether the City should be held liable for money damages under section 1983.

## IV. Appellants' *Monell* claims also fail because this Court found that the Officers did not violate clearly-established law.

The trial court alternatively held that, even if Officers Hess and Kimpel, used unreasonable deadly force, the City is entitled to summary judgment due to Appellants' inability to establish *Monell* liability. ROA.1417 n.9. It is axiomatic that a municipality is not liable for the unconstitutional actions of its employees on a respondeat superior

theory. *E.g.*, *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* (footnote omitted). To establish *Monell* liability, "a plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom.'" *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

As a matter of law, the policymaker for the City is the Dallas City Council. *Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016) (citing *Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008)). Here, Appellants do not contend that any official policy enacted by the city council is unconstitutional. *See generally* ROA.693-702. Instead, they assert that the City has a custom of failing to adequately train its police officers, and that alleged failure to train results in foreseeable constitutional violations. *See generally* ROA.693-702. Municipal liability

only attaches for such failure-to-train claims upon a showing that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city [here, the city council] can reasonably be said to have been *deliberately indifferent* to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (emphasis added). As the district court correctly held, this Court's precedent forecloses a finding of deliberate indifference on the part of the city council in this case, and Appellants therefore cannot establish liability under *Monell*.

This Court addressed this very issue in *Bustillos v. El Paso County Hospital District*, 891 F.3d 214 (5th Cir. 2018). There, the plaintiff accused medical staff at a county hospital of conducting unreasonably intrusive medical exams in violation of the Fourth Amendment. *Id.* at 218-19. This Court held that the medical staff were entitled to qualified immunity on the second prong of the qualified immunity inquiry, *id.* at 220-22, just as the Court held that Officers Hess and Kimpel were entitled to qualified immunity on the second prong of the qualified immunity analysis in this case, *Dawes I*, 2024 WL 2268529, at *2-4. The

49

Court in *Bustillos* then addressed the plaintiff's failure to train claims against the county hospital:

> Because [the plaintiff] did not demonstrate a clearly established right, **it follows that her claims for deliberate indifference against the District also fail**.
>
> The Amended Complaint's county liability theory is premised on the District's **deliberate indifference** to the need to train its personnel in how to handle government requests for body cavity searches. However, a policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established. The district court properly dismissed the county liability claim.

*Bustillos*, 891 F.3d at 222 (cleaned up) (bold emphasis added; italicized emphasis in original). Under this Court's rule of orderliness, *Bustillos* is controlling. The City cannot be deemed to be deliberately indifferent to Appellants constitutional rights when this Court has already held that those rights were not clearly established at the time of the incident in question. *See id.*

Appellants claim *Bustillos* does not apply and argue that "[t]his Court did not explain its conclusion, except to say that because the county liability theory was premised on the hospital district's 'deliberate indifference,' 'a "policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not

50

yet been clearly established.""" (Appellants' Br. 32 [quoting *Bustillos*, 891 F.3d at 222].) Regardless of how Appellants characterize this Court's holding in *Bustillos,* it remains controlling in this Circuit.

Appellants endeavor to distinguish *Bustillos* from this case by reaching through the opinion and into the district court record. They assert that "[a]lthough it is unclear from the opinion what the basis was for plaintiff's assertion of county liability, the actual complaint in *Bustillos* reveals that the municipal liability allegations were nothing more than vague and conclusory allegations" against the municipality. (Appellants' Br. 32.) Nonetheless, the conspicuous absence of any discussion of the quality and fulsomeness of the *Bustillos* plaintiff's pleading is telling. In *Bustillos*, this Court dispatched the governmental entity because—and only because—deliberate indifference, an essential element of a failure to train claim, could not be gleaned from a failure to train on law that was not clearly established, not because the plaintiff failed to adequately plead a detailed *Monell* claim.[4]

---

[4] Scholars of qualified immunity and *Monell* likewise understand this to be the settled law of this Circuit. One critic refers to it as "backdoor immunity" because, she argues, the employer benefits from the employee's qualified immunity. *See* Joanna C. Schwartz, *Backdoor Municipal Immunity*, 132 Yale L.J. Forum 136, 158 (2022) ("And because the Fifth Circuit has adopted backdoor municipal immunity, the grant of qualified immunity to the doctors and nurses doomed Bustillos's failure-to-train

Nothing in this Court's jurisprudence has changed since *Bustillos*. Appellants, however, claim that City may still be liable even if the individual defendants are dismissed based on qualified immunity. (Appellants' Br. 30.) They are wrong.

In arguing that the City may still be liable, Appellants primarily rely on an unreported case from the Western District of Louisiana, *Hershey v. City of Bossier City,* No. 21-CV-460, 2021 WL 4395056 (W.D. La. Aug. 23, 2021). This case, Appellants urge, holds that "the grant of qualified immunity to City employees does not necessarily preclude the City from being held liable." (Appellants' Br. 30 [citing *Hershey,* 2021 WL 4395056, at *7].) Relying on the district court's opinion in *Hershey*, Appellants insist "where claims are dismissed based on the lack of clearly established law, the City may still be liable." (Appellants Br. 30-31.)

Appellants filed their opening brief on October 30, 2025. (*See generally* Appellants' Br.) On October 7, 2025, this Court issued its opinion in *Hershey*. *Hershey v. City of Bossier City*, 156 F.4th 555 (5th

---

claim.") (citing *Bustillos*, 891 F.3d at 222)); *see also* Joanna C. Schwartz, *Municipal Immunity*, 109 Va. L. Rev. 1181, 1230–31 (2023) ("Further, in four federal circuits— the First, Fifth, Sixth, and Eighth—a grant of qualified immunity necessarily dooms a *Monell* claim for failure to train. The rationale . . . is that local governments be held responsible for failing to train officers about law that is not clearly established.")

Cir. 2025), *reh'g denied*, 2026 WL 98116 (5th Cir. Jan. 13, 2026). In *Hershey*, "a splintered panel decision" reversed the district court's dismissal of the *Monell* failure to train claim. *Id.* at 556. In doing so, one member of the panel observed:

> Although deliberate indifference is usually inferred from a pattern of constitutional violations, we will also infer it where the policymaker provides no training whatsoever with respect to the relevant constitutional duty.
>
> That's exactly what Hershey alleges here. His complaint contends that Bossier City did not train its police officers and private security personnel that the park surrounding the Bossier City Arena is public property, or that citizens are entitled to exercise their First Amendment rights there. Moreover, at oral argument, counsel for Hershey agreed that the officers "received literally zero training" on First Amendment issues. If these facts are true, they show that the City provided no training whatsoever regarding the application of the First Amendment to the park. They are facts sufficient to show that the city acted with deliberate indifference.

*Id.* at 561 (cleaned up) (Ho., J., concurring).

This reasoning does not change the central holding in *Bustillos* and its controlling import here. *Hershey* dealt with allegations of the type of "no training whatsoever" deliberate indifference as was found in prior cases. *See, e.g.*, *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 625 (5th Cir. 2018) ("Thus, for example, if a city policymaker opts to provide no

training whatsoever to police officers concerning the established and recurring constitutional duty not to use excessive deadly force, a factfinder may reasonably infer that the city acted with the requisite deliberate indifference."). Appellants' case does not. Indeed, they specifically assert that "the pattern of constitutional violations alleged by Plaintiffs here prove deliberate indifference by the City." (Appellants' Br. 14.) Appellants do not and cannot contend that the City provides no training whatsoever concerning the use of deadly force to its police officers. On the contrary, they affirmatively contend, albeit in conclusory fashion, that DPD's general orders on deadly force track the requirements of the Fourth Amendment. Thus, they had to prove through proof a pattern of similar constitutional violations, that the City's training regime was so deficient as to be deliberately indifferent to Appellants' constitutional rights. They have not done so. And because *Dawes I* held that the constitutional rights Appellants assert was violated is not clearly established, they cannot do so under *Bustillos*.

Appellants cite several other opinions of this Court—without explanation—for the proposition that dismissal of claims against an

employee based on qualified immunity does not relieve the employer from *Monell* liability. (Appellants' Br. 31.) These are inapposite.

Appellants cite *Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016). (Appellants' Br. 31.) There, the town's Board of Alderman allegedly violated a town employee's First Amendment rights by firing him for speaking with the FBI in a corruption investigation. *Id.* at 519. The members of the Board were dismissed in their individual capacities based on qualified immunity. *Id.* at 525-26. This Court noted that "the defense of qualified immunity is not available to the town of Ball." *Id.* at 527. However, it was undisputed that the Board was the "official policy maker" for Ball, and a "single unconstitutional action . . . may be sufficient in rare circumstances to impose municipal liability under *Monell*, if undertaken by the municipal official or entity possessing 'final policymaking authority' for the action in question." *Id.* Thus, while the *individual* members of the Board received personal immunity, the employee "offered evidence creating a genuine dispute of material fact regarding whether the town of Ball, acting through its official policy maker, the Board of Aldermen, is liable for the discharge" in retaliation

for exercising his First Amendment rights. *Id.* at 529. The circumstances in *Howell* critically differ from this case.

Appellants also cite a footnote in *Brown v. Lyford*, 243 F.3d 185, 191 n.18 (5th Cir. 2001). (Appellants' Br. 31.). *Brown* concerned claims of malicious prosecution and false arrest. *Id.* at 187-88. Again, as in *Howell*, the dispute centered around whether the public officials who had been personally dismissed under qualified immunity could still attach liability to the defendant county if they were policy makers for *Monell* purposes. *Id.* at 191-92. They were found not to be, so the county was dismissed. *Id.* As such, this case is also of no help to Appellants.

Lastly, Plaintiffs cite a 2019 case involving an officer-involved shooting, *Winzer v. Kaufman County*, 916 F.3d 464, 467 (5th Cir. 2019). However, this Court never held that a municipality could still be liable even if its employee was dismissed based on qualified immunity. Instead, the district court had dismissed the county because it found there was no constitutional violation. *Id.* at 477. Because this Court found genuine issues of material fact regarding whether a constitutional violation had occurred, the dismissal of the county was reversed. *Id.*

56

This Court's holding in *Bustillos* was, and remains, correct. As the district court explained below,

> [t]herefore, independent to and separate from the other analysis in this opinion, the Court determines that because there is no clearly established right, it follows that Dawes's claims against Dallas must also fail. This is a common-sense approach. How could a city have a policy of violating the Constitution, if the parameters of a constitutional violation are not clearly established? To hold cities to that standard, especially in the unwritten policy context, makes little sense.

ROA.1417 n.9.

This is correct. Under Supreme Court's and this Court's precedents, the standard of deliberate indifference is notoriously strict:

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

*Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (cleaned up).[5]

---

[5] *See also* Nancy Leong et. al., *Pleading Failures in Monell Litigation*, 73 Emory L.J. 801, 811 (2024) ("Most scholars have concluded that the reason plaintiffs rarely succeed in holding municipalities liable for constitutional violations is that the municipal liability standard articulated by the Supreme Court is highly demanding.")

As detailed above, the City's training and oversight go well beyond constitutional norms. But for purposes of *Monell* liability, without the benefit of defined contours of what is "clearly established," municipalities cannot design multiyear, multimillion dollar training and oversight programs with such granular particularity as to "catch" and "prevent" actions not yet determined to be clearly unconstitutional.

To require municipalities to train, oversee, and discipline its officers on unclear law is even less reasonable given that learned scholars and jurists themselves often passionately and thoughtfully disagree about the outer limits of the constitutional duties law enforcement is expected to follow. As noted above, the *Hershey* opinion concerning what constitutes retaliation under the First Amendment issued from a "splintered panel." *Hershey*, 156 F.4th at 556. Similarly, in the case of *Cole v. Carson*, after multiple panels' examinations and a reversal at the Supreme Court, another fiercely divided panel disagreed on critical issues related to the use of deadly force in split-second circumstances. *See generally* 935 F.3d 444 (5th Cir. 2019). Or, more recently, a denial of en banc related to qualified immunity in an officer-involved shooting case yielded multiple dissents. *See generally Crane v. City of Arlington*, 60

F.4th 976, 978-79 (5th Cir. 2023) (Oldam, J., dissenting from denial of rehearing en banc). If closely divided courts cannot agree on what amounts to a violation of the Constitution, how, then, can a municipality be found retroactively "deliberately indifferent" to that same act?

Regardless, *Bustillos* remains the law of this Circuit. Where, as here, a municipality's employee has not violated "clearly-established law," that municipality cannot be held liable under *Monell* on a failure to train theory. As such, the district court correctly entered summary judgment for the City.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment.

Respectfully submitted,

TAMMY L. PALOMINO
City Attorney

JENNIFER C. HUGGARD
Chief of Litigation

NICHOLAS D. PALMER
Chief of Appellate Section

*/s/ J. Cheves Ligon*
LINDSAY WILSON GOWIN
Texas Bar No. 24111401
lindsay.wilson@dallas.gov

J. CHEVES LIGON
Texas Bar No. 24070147
john.ligon@dallas.gov
Assistant City Attorneys

CITY ATTORNEY'S OFFICE
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
Telephone: 214-670-3519
Telecopier: 214-670-0622

ATTORNEYS FOR APPELLEE

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d) and Fifth Circuit Rule 25.2, I hereby certify that on January 30, 2026, the foregoing document was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit, using the electronic filing system of the Court. I further certify that I have complied with the privacy and redaction requirements of Federal Rule of Appellate Procedure 25(a)(5) and Fifth Circuit Rule 25.2.13; that the electronic submission is an exact copy of the paper document; and that the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Additionally, on January 30, 2026 a true and correct copy of the foregoing document was served via ECF electronic notice through the Court's Notice of Docket Activity upon Thad D. Spalding, Shelby White, and Daryl K. Washington, counsel for Appellants, who have consented in writing to accept such notice as service of this document by electronic means.

*/s/ J. Cheves Ligon*
Attorney for City of Dallas

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface requirements and Type Style Requirements

1.  This brief complies with the type volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    ☐   this brief contains 10,199 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    ☐   this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook.

*/s/ J. Cheves Ligon*
Attorney for City of Dallas

Dated:  January 30, 2026